## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Case No: 09-14541 (    ) |
| AeroThrust Corporation and AeroThrust Engine Leasing Holding Company, LLC, | Chapter 11 |
| Debtors and Debtors-in-Possession. | (Joint Administration Requested) |

## AFFIDAVIT OF JOHN F. RISKO IN SUPPORT OF CHAPTER 11 PETITIONS AND VARIOUS FIRST DAY APPLICATIONS AND MOTIONS

| | | |
|---|---|---|
| STATE OF CALIFORNIA | ) | |
| | ) | ss: |
| COUNTY OF LOS ANGELES | ) | |

I, John F. Risko, duly sworn according to law, upon my oath depose and say:

1.      I am the Chief Executive Officer of AeroThrust Corporation ("*AeroThrust*"), a Delaware corporation, and a Manager of its subsidiary, AeroThrust Engine Leasing Holding Company, LLC ("*AeroThrust Holding*" and together with AeroThrust, the "*Debtors*"). AeroThrust Holding is a limited liability company also organized under the laws of Delaware. AeroThrust and AeroThrust Holding are both debtors and debtors in possession in the above-captioned chapter 11 proceedings.

2.      I submit this affidavit in support of the Debtors' (a) voluntary petitions for relief under Chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "*Bankruptcy Code*"); and (b) the Debtors' so-called "first day" motions and applications, which are being filed simultaneously herewith (the "*First Day Motions*"). The First Day Motions seek to minimize disruption to the Debtors' business operations, employees and customers while facilitating the reorganization process.

3.     I am familiar with the day-to-day operations, business and financial affairs of the Debtors.  Except as otherwise noted, the facts in this affidavit are based upon my personal knowledge, my review of relevant business records of the Debtors, and my experience with the Debtors and in the industry, as well as my knowledge and information concerning the Debtors' operations.

## Debtors' Business Operations and Events Leading to Chapter 11 Filings

4.     On December 27, 2009 (the "*Petition Date*"), each of the Debtors filed a voluntary petition for relief under Chapter 11.  The Debtors continue to operate their businesses and manage their properties as debtors in possession.

5.     AeroThrust is primarily engaged in the sale of aircraft engines and provision of aircraft engine maintenance, report and overhaul services to commercial passenger airlines, air cargo carriers and the United States military.  AeroThrust Holding, through a wholly-owned subsidiary, is engaged in the financing of engines to be leased and began operations in May 2008.  AeroThrust Holding is 51% owned by AeroThrust, and the remaining 49% minority interest is owned by individuals who contributed approximately $374,000 in cash during 2008.

6.     The Debtors' headquarters and 140,000 sq. ft. engine shop are located in South Florida to permit convenient worldwide access.  In addition, AeroThrust has an office in Christchurch, New Zealand and representatives in Europe, Asia and South America.

7.     AeroThrust has produced over 9,000 engines since 1946.  The company is certified as a repair station by the Federal Aviation Administration and European Aviation Safety Agency, maintains an ISO 9001:2000 certification and is licensed as a repair company in several other countries.  AeroThrust Holding presently leases two engines.

8.     In their draft financial statements for the fiscal year ended December 31, 2008, the Debtors and their non-debtor subsidiaries reported consolidated net sales of $98.6 million and a net loss of $2.6 million. As of December 31, 2008, the Debtors reported total assets of approximately $71.8 million, total liabilities of about $55.8 million, and positive stockholder's equity of approximately $16.0 million. For the ten (10) months' ended October 31, 2009, the Debtors and their non-debtor subsidiaries reported on an unaudited basis total sales of approximately $58.0 million, a net loss of $7.7 million, total assets of approximately $53.5 million, total liabilities of approximately $45.6 million and positive stockholders' equity of $7.9 million. The Debtors have incurred additional losses since October 31, 2009.

9.     A substantial portion of the Debtors' secured debt is held by PNC Bank, N.A. ("*PNC Bank*"). That debt arose as a result of a Loan and Security Agreement dated as of August 9, 2005 (the "*Original Loan Agreement*"), whereby AeroThrust obtained from PNC Bank a revolving credit facility of $20,000,000, a term loan of $1,000,000 and capital expenditure loans of $2,000,000. Beginning in or about May 2006, the Original PNC Loan Agreement was amended from time to time most recently in June 2008 (the "*PNC Loan Amendments*" and together with the Original PNC Loan Agreement, the "*PNC Loan Agreement*"). During the course of the amendments, another non-debtor subsidiary of AeroThrust, AeroThrust Capital Corporation, became a co-borrower under the agreement. AeroThrust also entered into an Export Import Loan and Security Agreement dated as of August 9, 2005 (the "*ExIm Agreement*"), as amended, by and among AeroThrust and PNC Bank as Agent and Lender in the original amount of $6,000,000. In addition, AeroThrust also entered into a Revolving Credit Agreement in the principal amount of $5,000,000 dated as of

February 16, 2007 (the "*Engine Purchase Agreement*" and together with the Original PNC Loan Agreement and the ExIm Agreement, the "*PNC Loan Agreements*").

10.     PNC's total claims are approximately $11,630,033.99 as of December 24, 2009, which claims arise from amounts due under the Original PNC Loan Agreement.  PNC asserts that its claims are secured by first liens and security interests in substantially all of AeroThrust's assets, including accounts, chattel paper, documents, instruments, general intangibles, goods, inventory, equipment, fixtures, as well as the pledged shares evidencing the equity ownership of AeroThrust Holding pursuant to certain UCC-1 filings (the "*Financing Statements*" and together with the PNC Loan Agreements, the "*Loan Documents*").  The Debtors believe that the value of the collateral securing their obligations to PNC Bank is well in excess of the amount due PNC under the Loan Documents.

11.     AeroThrust's current monthly interest obligation under the PNC Loan Documents is approximately $70,000 a month, with an interest rate of 5.25% on its revolving credit facility and 5.50% on the capital expenditure loan.

12.     AeroThrust is also obligated to pay Celsius Holdings Delaware Corporation on a Third Amended and Restated Secured Promissory Note dated December 15, 2007 (the "*Celsius Note*").  The principal amount of the Celsius Note is $3.89 million as of December 11, 2009, and principal is payable in quarterly principal installments of $290,000 until January 15, 2010, with the balance due on April 1, 2010.  Under the terms of the Celsius Note, the Company has to comply with certain financial operational covenants, and the Celsius Note is cross-defaulted with other loan agreements.  The Celsius Note is subordinated pursuant to an intercreditor agreement to the PNC Loan Agreements.  In addition, the Celsius Note is

4

allegedly collateralized by all of AeroThrust's assets, excluding inventories and receivables, and by a pledge of AeroThrust's common stock owned by Windstar Capital LLC.

13.    AeroThrust Holding is also a party to an agreement with Erste Bank Der Oesterreichischen Sparkassen AG, London Branch ("*Erste Bank*") under a Loan Agreement dated June 22, 2008, as amended, by and among Erste Bank, AeroThrust Holding as parent and its non-Debtor subsidiary, AeroThrust Engine Leasing, Inc., as borrower. The principal amount outstanding to Erste Bank is $2,376,824. The obligations to Erse Bank are comprised of two term loans requiring monthly payments of approximately $196,000 through October 2010 and February 2011, respectively, including principal and interest, and are alleged to be secured by mortgages on two CFM56-3 engines with a net book value of approximately $4.6 million, security deposits totaling $632,000 deposited with the commercial lender and a pledge of the members' equity shares of AeroThrust Holding. AeroThrust Leasing leases the engines to AeroThrust, which makes monthly lease payments to AeroThrust Holding that are used to pay the mortgage obligations to Erste Bank.

14.    Due to reduced revenues and operating losses, the Debtors anticipated liquidity constraints and made efforts prior to the Petition Date to obtain additional capital. The Debtors were unable to attract the necessary amount of additional capital that they projected would be required to allow them to avoid seeking relief in this Court.

15.    The Debtors intend to utilize Chapter 11 to pursue a sale of substantially all of their assets and on-going business operations pursuant to Section 363 of the Bankruptcy Code. The Debtors believe that its existing facilities and customer agreements and contacts are valuable assets and that the protections afforded by Chapter 11 will allow the Debtors to maximize their value for the benefit of all stakeholders.

**First Day Applications And Motions**

16.     In furtherance of their reorganization, the Debtors request that certain "first-day" orders be granted by the Court. Support of such First Day Motions is provided below.

### A.     Joint Administration Motion

17.     The Debtors seek the joint administration of these Chapter 11 Cases for procedural purposes only. It would be both practical and expedient for the administration of these Chapter 11 Cases if the Court authorizes their joint administration. Many of the motions, hearings and other matters in these Chapter 11 Cases will affect both of the affiliated Debtors. Moreover, many parties with an interest have overlapping interest in both Debtors' affairs. Joint administration will, therefore, reduce costs and facilitate the administrative process by avoiding the need for duplicate service of notices, applications and orders. Joint administration will also avoid the procedural problems sometimes resulting from separate administration. Finally, there is no prejudice in the joint administration of the Debtors' cases as the relief is procedural only and not intended to affect substantive rights.

### B.     Applications to Retain Professionals

18.     The Debtors seek authority to retain Wollmuth Maher & Deutsch LLP ("*Wollmuth*") and Bifferato LLC ("*Bifferato*") as bankruptcy co-counsel and J.H. Cohn LLP ("*J.H. Cohn*") as financial advisors.

19.     The Debtors have selected Wollmuth and Bifferato as bankruptcy co-counsel under a general retainer because both Wollmuth and Bifferato have extensive experience with business reorganizations under Chapter 11 of the Bankruptcy Code. Moreover, both firms have been working closely with the Debtors to file these Chapter 11 cases and thus have substantial knowledge of the Debtors' financial affairs, capital structure and of the potential legal issues

that may arise in the context of these proceedings. I believe that Wollmuth's and Bifferato's hourly rates are fair and reflect the level of each professional's experience as well as the complexity and time-pressures involved in the prosecution of these Chapter 11 cases.

20. The Debtors have selected J.H. Cohn as their financial advisor because of J.H. Cohn's extensive experience with business reorganizations under Chapter 11 of the Bankruptcy Code. The Debtors anticipate J.H. Cohn's professionals working closely with the Debtors' management and other professionals to review strategic options and financial information and to assist in the preparation of cash-flow projections, as well as to provide such other professional services are needed to prosecute the Debtors' reorganization. Consequently, I believe that J.H. Cohn possesses the requisite knowledge and experience to assist the Debtors and their other professionals in maximizing the value of the Debtors' estates. I believe that J.H. Cohn's hourly rates are fair and reflect the experience of the professionals involved, in addition the complexity and time-pressures involved in these cases.

## C. Cash Management Motion

### (a) The Debtors' Cash Management System and Bank Accounts

21. In the ordinary course of business, the Debtors maintain an integrated cash management system that provides mechanisms for collection, concentration, management and disbursement of funds used for their operations (the "*Cash Management System*"). The Cash Management System consists of numerous bank accounts (collectively, the "*Bank Accounts*") held in two banking institutions, PNC Bank, N.A. and Bank of America, N.A. (collectively, the "*Cash Management Banks*"). The Cash Management System is used to receive incoming payments and make disbursements in the ordinary course of the Debtors' businesses.

22.     AeroThrust maintains a master account at Bank of America for general corporate purposes (the "**Master Account**").  AeroThrust also maintains two (2) Bank of America accounts, which exist solely to fund payroll.  AeroThrust also maintains one (1) Bank of America account to make disbursements, such as satisfying accounts payable.  AeroThrust also maintains two blocked accounts for collecting foreign and domestic receivables.  As of the Petition Date, the Debtors have approximately $470,000 in their various accounts with the Cash Management Banks.

23.     AeroThrust is also the beneficiary of a Bank of America Certificate of Deposit in the amount of $205,856 that is used to secure a Bank of America-issued letter of credit in favor of the Miami Dade Aviation Department.  The letter of credit is required in order for AeroThrust to conduct its business operations.

24.     AeroThrust also maintains two repayment accounts and one operating account with PNC Bank for advances and repayments of the amounts due PNC under the Loan Documents.

25.     AeroThrust Holding does not have any bank accounts, although its non-debtor subsidiary maintains an operating account with Bank of America.

(b)     The Flow of Funds

26.     When advances are needed under the PNC Loan Agreement, a request is faxed and the funds are deposited into AeroThrust's Operating Account in PNC Bank.  A wire is initiated from that account into the BOA Master Account.  Customers payments are wired directly into Bank of America's blocked accounts (one for domestic customers, another for foreign customers).  If AeroThrust receives payments by checks, the checks are deposited in the domestic blocked account.  When funds are available (next business day for wires and two

(2) to five (5) days in the case of checks), Bank of America sends an automatic wire in the morning to AeroThrust collection accounts in PNC (one for domestic, one for foreign). The reduction in the line of credited is posted the following day after the wire is received into the collection account.

(c)     Existing Business Forms

27.     As part of the Cash Management System, in the ordinary course of business, the Debtors use a variety of business forms, including, without limitation, checks, letterhead, purchase orders and invoices. At this time, the Debtors have a sufficient stock of such forms on hand to continue operating in the ordinary course of business.

(d)     Intercompany Claims and Intercompany Transactions

28.     The Debtors and certain non-Debtor affiliates maintain business relationships with each other (the "*Intercompany Transactions*") resulting in intercompany receivables and payables in the ordinary course of business (the "*Intercompany Claims*"). In connection with the daily operation of the Cash Management System, as funds are disbursed throughout the Cash Management System and as business is transacted between the Debtors and their non-Debtor affiliates, at any given time there may be Intercompany Claims owing by one Debtor to another Debtor or between a Debtor and a non-Debtor affiliate. The Debtors track all fund transfers in their accounting system and can ascertain, trace and account for Intercompany Transactions.

**D.     Utilities Motion.**

29.     In the ordinary course of their business, the Debtors incur utility expenses for, among other things, phone, high-speed internet, provided by their utility providers (collectively, the "*Utility Providers*").

30.     Prior to the Petition Date, the Utility Providers provided utility service to the Debtors in Miami, Florida. Ordinarily, the Debtors pay each Utility Provider directly upon receipt of a monthly invoice for services provided during the immediately preceding month. On average, the Debtors spend approximately $6,000 monthly on utility costs. As of the Petition Date, the Debtors do not believe they had any significant deposits with their Utility Providers. Prior to the Petition Date, the Debtors usually were timely but occasionally fell behind. Due to the timing of the Petition Date in relationship to the Utility Providers' respective billing cycles, the Debtors believe certain utility costs have been invoiced but have not been paid because payment is not yet due. Further, certain utility costs for services provided since the end of the last billing cycle have not been invoiced to the Debtors yet.

31.     Uninterrupted utility services are essential to the Debtors' ongoing operations. Should the Utility Providers refuse or discontinue service, even for a brief period, the Debtors' business operations would be severely disrupted. The impact on the Debtors' business operations would be extremely harmful and would jeopardize the Debtors' ability to continue operations.

### E.     Employee Wages Motion

#### (a)     The Debtors' Employees

32.     All of the Debtors' 131 employees are employed by AeroThrust. AeroThrust funds all of the Debtors' employee wages, expense obligations and benefit obligations and invoices AeroThrust Holding for the claims and expenses relating to the employees performing services for AeroThrust. Unless otherwise noted, all references contained herein to payments being made by the Debtors refer to payments made by AeroThrust.

33.     Approximately eighty (80) of the employees are hourly wage earners ("*Hourly Employees*") and approximately fifty-one (51) represent salaried personnel ("*Salaried Employees*"). Seventy-seven (77) employees ("*CBA Employees*") are union employees and are the subject of a collective bargaining agreement dated April 17, 2008 between AeroThrust and International Association of Machinist and Aeropace Workers (the "*CBA*").

34.     The Employees operate primarily out of the Miami, Florida location.

(b)     Prepetition Wages, Salary and Other Compensation

35.     Prior to the Petition Date and in the ordinary course of their businesses, the Debtors paid or honored employee wages and salaries as well as other forms of compensation.

36.     Hourly Employees are paid every Friday for the period ending the Sunday before the pay date. The last pay date for Hourly Employees was on December 23, 2009 (two days early due to the Christmas holiday), in which the Debtors paid wages and salaries earned by employees through December 20, 2009. Salaried Employees are paid every other Friday for the two-week period ending that day. The last pay date for Salaried Employees was on December 23, 2009, in which the Debtors paid wages and salaries earned by employees through that date (two days early due to the Christmas holiday).

37.     The monthly average historical payroll for the Debtors' employees in a typical month was approximately $800,000, or approximately $200,000 per pay period. The Debtors estimate that approximately $90,000 in payroll (inclusive of payroll taxes), exists in accrued but unpaid payroll for employees as of the Petition Date. All of the Debtors' payroll functions are administered by AeroThrust, and the Debtors manage the actual disbursements of payroll funds to employees.

       (c)    Paid Time Off

38.    The Debtors offer employees other forms of compensation, including vacation time, paid holidays, other earned time off that varies either with the type of employment or as established under the CBA.

39.    Vacation Time begins to accrue from an employee's date-of-hire and is earned in specific increments based upon an employee's length of service and are subject to certain caps. Except for CBA Employees, vacation days must be used in the calendar year earned unless agreed by supervisor. Thus, the Debtors anticipate that there is accrued vacation pay due and owing of $941,500 as of the Petition Date.

40.    The Debtors permit each hourly employee six (6) paid sick days. CBA Employees can bank sick days up to a maximum of sixty (60). Salaried employees are permitted sick days but there is no specific amount, however, the Debtors' reserve the right to suspend such days if management believes it is being abused.

       (d)    Employee Expense Obligations

41.    The Debtors routinely reimburse employees for certain expenses incurred within the scope of their employment, including expenses for travel, lodging, professional seminars and conventions, ground transportation, meals, supplies and miscellaneous expenses (collectively, "***Business Expenses***"). The Debtors pay these amounts as they come due and estimate that only nominal amounts will remain outstanding in connection with these expenses as of the Petition Date.

42.    As of the Petition Date, approximately twenty-two (22) employees utilize company credit cards issued in their name for business expenses incurred in the operations of the Debtors' businesses. The Debtors pay an average of approximately $115,000 per month in

connection with the use of the credit cards. The Debtors have remitted all sums due and owing for November 2009, but estimate that approximately $115,000 in unreimbursed expenses in connection with the Reimbursement Program may be outstanding as of the Petition Date.

43.     The Debtors process expense reports weekly. Certain employees have not yet been reimbursed for reimbursable expenses previously incurred. The Debtors pay approximately $25,000 on average to employees and third-parties with respect to reimbursable expenses each month. Although the Debtors cannot fully estimate the amount of reimbursable expenses outstanding as of the Petition Date because not all employees will have submitted expense reports as of the Petition Date, the Debtors expect the amount to be at or below the monthly average.

(e)     Employee Benefit Obligations

44.     The Debtors maintain various employee benefit plans and policies that provide eligible employees with medical, dental, vision, life insurance, disability, FSA, employee assistance and 401(k) plans. The Debtors also provide workers' compensation benefits to eligible employees.

45.     The Debtors provide participating employees and their dependents with self-insured health and welfare plan (the "*HW Plan*") that is administered by a third party administrator, UMR. The prescription drug program offered in connection with the self-insured HW Plans is administered by Medco Health. As of the Petition Date approximately 161 employees and COBRA participants and 242 dependents were covered under the HW Plan.

46.     The HW Plan cost is funded out of the general assets of the Debtors, but employees contribute through payroll deductions, co-pays, deductibles and maximum benefit

13

limitations. The Debtors pay an average of approximately $80,000 a month in medical claims, which payments are made eight (8) to ten (10) weeks after a claim is made.

47.     The Debtors also offer dental benefits (the "*Dental Plan*") through a self-funded plan administered by Fiserv and vision coverage (the "*Vision Plan*"). As with the HW Plan, employees contribute through payroll deductions, co-pays, deductibles and maximum benefit limitation.

48.     On average, in 2008, the Debtors paid an average of approximately $327,000 in the aggregate each month for employees and their dependents in connection with the HW, Dental and Vision Plans. As of the Petition Date, the Debtors' estimated liabilities under the HW and Dental Plans were approximately $1,280,000 in the aggregate.

49.     In addition, the Debtors offer their employees the use of flexible spending accounts for various health care and dependant care (the "*FSA Programs*") costs not otherwise covered by the HW Plan. The flexible spending benefits are administered by AeroThrust's H.R. department. There remain amounts due and owing under the FSA Programs in an undetermined amount.

50.     The Debtors provide employees with life insurance, accidental death and dismemberment and short term disability optional insurance. The Debtors offer non-CBA Employees, business travel insurance and long-term disability insurance as well. The Debtors pay an average of $20,000 per month on account of the two programs. The Debtors are current as of the Petition Date with regard to the various insurance plans.

51.     Eligible employees may contribute 1% to 20% of their 401(k) eligible compensation (the "*401(k) Plan*") through payroll deductions. The 401(k) Plan is managed by Principal Financial Group. Principal Financial Group charges fees of approximately $15,000

per year. The Debtors provide a match of 75% of each an employee's 401(k) contribution up to a maximum of 6%.

52.     The Debtors do not believe there are outstanding administrative fees for the 401(k) Plan as of the Petition Date.

53.     The Debtors also provide tuition reimbursement for continuing education directly related to an employee's job of up to $2,000 per calendar year. The Debtors are uncertain as to the outstanding reimbursement owed as of the Petition Date.

54.     The Debtors provide workers' compensation benefits to all employees. These benefits are covered primarily under the Debtors' workers' compensation insurance program, which is administered by Pacific Indemnity through broker Arthur J. Gallagher. Failure to maintain this insurance in the various states in which the Debtors do business could result in administrative or legal proceedings against the Debtors and their officers and directors.

        (f)     Withheld Funds

55.     The Debtors routinely withhold from employee paychecks amounts that the Debtors are required to transmit to third parties. Examples of such withholdings include federal and state income taxes, social security, Medicare, garnishments and premiums for medical, dental and life insurance and 401(k) contributions.

**F.     Prepetition Taxes Motion**

56.     In the ordinary course of business, the Debtors collect sales taxes from their customers and incur taxes, including, but not limited to Sales Taxes, Use Taxes (each as defined below) and other similar taxes necessary to operate their businesses (collectively, the "***Sale and Use Taxes***") on behalf of various federal, state and local taxing authorities, licensors or other government authorities (collectively, the "***Authorities***"). The Debtors pay the Sales

15

and Use Taxes monthly, quarterly, or annually to the respective Authorities, in each case as required by applicable laws and regulations.

57.    The Debtors collect from customers and remit an assortment of state and local sales and gross receipts taxes (collectively, the "*Sales Taxes*") to various Authorities. On a periodic basis, the Debtors remit to the Authorities the Sales Taxes collected during the previous term.

58.    The Debtors may also be responsible for the payment of use taxes (the "*Use Taxes*") when they purchase tangible personal property from suppliers. Use Taxes arise when the Debtors purchase equipment from a supplier for use in a state in which the supplier has no business operations. Without such a nexus, the supplier is not obligated to collect or remit sales taxes. Nevertheless, the Debtors as the purchasers are obligated to self-assess and pay the Use Taxes to the states or local taxing jurisdictions wherein the personal property is used. The Debtors' obligations to self-assess and pay Use Taxes also may arise in a number of states in which the Debtors have received authorization to self-assess and remit Use Taxes. The Debtors generally remit the Use Taxes to Authorities on a monthly, quarterly, or annual basis. The Debtors estimate that they owe about $2,000 in Sales and Use Taxes to certain of the Authorities for periods prior to and including the Petition Date.

### G.    Prepetition Customer Warranties

59.    The Debtors may also be responsible repairs under written warranties given to customers (*"Customer Warranties"*). The Debtors generally warranty MRO services for 2,000 hours. Should a customer have a problem with an engine that the Debtors' serviced, the Debtors will provide labor, repair an/or replace any defective parts that are the covered by such warranty. The Debtors cannot estimate the potential dollar amount of such warranty claims

16

individually or in the aggregate, as such claims are not common and the dollar amount associated with claims varies widely. However, in order to maintain customer relations and to preserve the businesses of the Debtors, the Debtors seek, in their discretion, the authority to continue to honor prepetition warranties in the ordinary course.

**<u>Remainder of Page Intentionally Left Blank</u>**

## **CONCLUSION**

The Debtors' immediate objective is to maintain "business as usual" following the Petition Date by minimizing any adverse impact from the filings on the Debtors' operations. For the reasons described herein and in the First Day Motions, it is respectfully submitted that the prospect for achieving these objectives for the benefit of creditors and other parties in interest will be substantially improved should the Court grant the relief in the First Day Motions.

SWORN AND SUBSCRIBED before
me this 24 day of December, 2009.



Notary Public
My Commission Expires: 7 17 13

ANETTE V. MULLEM
Commission # 1858193
Notary Public - California
Los Angeles County
My Comm. Expires Jul 17, 2013

18